IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BRITTANY IVINS,

               Plaintiff,

   v.

PENNSYLVANIA DEPARTMENT OF
CORRECTIONS-STATE CORRECTIONAL
INSTITUTE AT GRATERFORD,

               Defendant.

CIVIL ACTION
NO. 17-5777

## OPINION

**Slomsky, J.**                                                    **February 15, 2019**

## I.    INTRODUCTION

Plaintiff Brittany Ivins ("Plaintiff") brings this suit against her former employer, the Pennsylvania Department of Corrections, State Correctional Institute at Graterford ("Defendant"), pursuant to Title VII of the Civil Rights Act of 1964, 32 U.S.C. § 2000(e), et seq., and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. C.S.A. § 951, et seq. She alleges that Defendant subjected her to a hostile work environment and engaged in retaliation by firing her for filing a sexual harassment complaint. (Doc. No. 1.)

In Count I of the Complaint, Plaintiff alleges violations of Title VII, claiming that "[t]he actions of Defendant, through its agents, servants and employees, subject[ed] Plaintiff to a hostile work environment, sexual harassment, and sex discrimination." (Id. at 12.) In Count II, Plaintiff alleges that Defendant violated Title VII by "retaliating against Plaintiff for registering a complaint of unlawful sexual harassment in the workplace . . . ." (Id.) In Count III, Plaintiff alleges that Defendant subjected her to a hostile work environment in violation of the PHRA. (Id. at 13.)

Finally, in Count IV, Plaintiff alleges that Defendant retaliated against her in violation of the PHRA. (Id. at 14.)

On November 26, 2018, Defendant filed a Motion for Summary Judgment (Doc. No. 14), and in support of the Motion, submitted a Statement of Undisputed Facts (Doc. No. 14-2). On December 31, 2018, Plaintiff filed a Response in Opposition to Defendant's Motion for Summary Judgment, in which she disputed several of Defendant's undisputed facts and provided a recitation of the facts in the light most favorable to her. (Doc. No. 17.) Finally, on January 11, 2019, Defendant filed a Reply in support of its Motion. (Doc. No. 20.)

Defendant's Motion for Summary Judgment is now ripe for disposition. For reasons stated infra, the Motion will be granted in part and denied in part.

## II.    BACKGROUND

### A.  Plaintiff Brittany Ivins' History with Correctional Officer Jeremy Reimert

On October 5, 2015, Defendant Pennsylvania Department of Corrections hired Plaintiff Brittany Ivins as a Corrections Officer Trainee. (Doc. No. 14-2 ¶¶ 1, 2.) After a four-week training course, Plaintiff started work at the State Correctional Institution at Graterford ("SCI-Graterford"), where she would remain for the duration of her employment with Defendant. (Id. ¶ 2.) As a Trainee, Plaintiff "sought to immerse herself in advancement opportunities presented by Defendant." (Doc. No. 17 at 2; Doc. No. 17-2 at 53:3-14.) With that goal in mind, she expressed an interest in joining the Fire Emergency Response Team ("FERT"), which responds to fires and emergencies within the prison, and the Honor Guard, which organizes prison events, including funerals, ceremonies, and dedications. (Doc. No. 17-2 at 53:3-14.)

Due to her interest in FERT and the Honor Guard, co-workers suggested that Plaintiff seek the advice of Jeremy Reimert, a Correctional Officer One and a longtime member of both organizations. (Id. at 52:4-14.) Plaintiff did so, and Reimert later became her "mentor." As a

Correctional Officer One, Reimert ranked higher than Plaintiff in the prison employee hierarchy. At one point, Reimert gave a presentation to Plaintiff and other employees at an annual training (id. at 52:2-24), but otherwise, he did not have the power to give her assignments, evaluate her work, or discipline her.  (Id. at 56:24-57:7, 58:14-59:25.)

When Plaintiff first met Reimert, he was married.  (Doc. No. 14-2 ¶ 26.)  But not long after Plaintiff began work at SCI-Graterford, Reimert started to pursue her romantically.   He first made sexual advances towards her in December 2015.   On that occasion, Reimert took her to a gun range, where Plaintiff claims he exposed himself to her and attempted to grope her.  (Doc. No. 17-5 at 27:2-28:17.)  Notwithstanding this incident, Plaintiff soon thereafter commenced a consensual romantic relationship with Reimert.[1] (Doc. No. 14-2 ¶ 25.)

Reimert admits that he disclosed his relationship with Plaintiff to many co-workers and frequently discussed the nature of their sex life in the workplace.  (Doc. No. 17-4 at 37:8-38:3.) As a result, several co-workers propositioned Plaintiff and made lewd sexual comments in her presence.  (Doc. No. 17-1 ¶ 28.)  For example, several co-workers asked Plaintiff whether she would "hook up" with them.  (Id.)  On one occasion, when Plaintiff was ill, co-workers asked her whether she was pregnant with Reimert's child.  (Id.)  Further, Plaintiff testified in her deposition that Reimert encouraged their co-workers to ask her lewd sexual questions.  For instance, in her deposition, Plaintiff stated that Reimert encouraged male co-workers to ask Plaintiff if she would "take care" of their sexual needs.  She also testified that Reimert encouraged co-workers to ask Plaintiff whether Reimert was "bang[ing] her" and whether he "made her cum." (Doc No. 17-5 at

---

[1]   Defendant does not have a policy that prohibits employees from dating each other.  (Doc. No. 21 ¶ 29.)

31:5-32:8.) Reimert also spread rumors that Plaintiff was engaging in oral sex with co-workers in the bathrooms at SCI-Graterford. (Doc. No. 17-3 at 167:21-34.)

Aside from the lewd sexual comments directed to her at work, Plaintiff claims that her relationship with Reimert was rocky. In her deposition, she testified that Reimert physically abused her, often leaving bruises and scratches. (Doc. No. 17-4 at 33:13-24.) Furthermore, she asserts that she frequently told Reimert that she wanted to end their relationship, but Reimert "would threaten to commit suicide and to ruin Plaintiff's reputation by further exposing their sexual relationship." (Doc. No. 17 at 4.) At one point, Reimert told Plaintiff to stop engaging in conversations with male co-workers and threatened to assault male co-workers if they spoke to her at work. (Doc. No. 17-5 at 32:9-33-5.)

In June 2016, Plaintiff reported Reimert's sexual harassment to Sergeant Jay Hull and Sergeant N. Davis, her trainee supervisors, and Dana Williams, the Director of Human Resources at SCI-Graterford. (Doc. No. 17-5 at 36:1-37:25.) On June 16, 2016, she called out of work less than an hour before her shift was scheduled to start. (Doc. No. 21 ¶ 32.) That day, she met with Lieutenant Heidi Glenn, her direct supervisor, at SCI-Graterford to discuss Reimert's conduct. (Doc. No. 17-2 at 112:5-113:3.) At that meeting, Plaintiff told Lieutenant Glenn that she was "afraid of reporting [Reimert]" and that she "didn't want to get him in trouble." (Id. at 113:16-22.) Upset from the stress of the meetings, on June 18, 2019, Plaintiff took a day of "non-prescheduled leave," which is considered an unexcused absence. (Doc. No. 21 ¶ 34.) Around this time, Plaintiff filed a sexual harassment complaint against Reimert with the State Employee Assistance Program ("SEAP"). (Id. at 116:1-23.) At no point did Defendant or any of its employees investigate Plaintiff's allegations concerning Reimert's conduct. (Doc. No. 17-7 at 65:21-66:21.)

On June 17, 2016, Reimert took a leave of absence under the Family and Medical Leave Act ("FMLA"). (Doc. No. 14-2 ¶ 35.) In July 2016, Plaintiff attempted to end their relationship. Still, Reimert continued to contact her. On July 14, 2016, Reimert called her repeatedly while she was in her car on her way to work. Because of these phone calls, Plaintiff testified that she was unable to open the GPS in her car, missed her exit on the highway, and was late for her shift at the prison. (Doc. No. 17-3 at 58:1-59:2.) Then, on July 19, 2016, Plaintiff claims that "Reimert arrived at her home, forced his way into Plaintiff's apartment, accused her of engaging in sexual intercourse with another co-worker, and brandished his firearm." (Doc. No. 17 at 8.) She also claims that "Reimert threatened to commit suicide and sexually assaulted [her]."[2] (Id.) Distressed, Plaintiff called out of work that day. (Id.)

On August 1, 2016, Plaintiff met with Dana Williams, the Human Relations Director at SCI-Graterford, for a second time to discuss Reimert's conduct. At this meeting, Williams recommended that Plaintiff seek a Protection From Abuse Order ("PFA"), which she obtained the next day. (Doc. No. 14-2 ¶¶ 51, 52.) On August 3, 2016, Reimert obtained a PFA against Plaintiff. (Id. ¶ 53.) As a result, on August 15, 2016, SCI-Graterford Superintendent Cynthia Link sent a letter to Reimert, informing him that he should not return to work until he resolved the restrictions contained in Plaintiff's PFA, namely that he could not contact Plaintiff. (Doc. No. 14-7 at 61.)

### B. Plaintiff Brittany Ivins' History of Absence and Tardiness While Working at SCI-Graterford

Throughout her employment at SCI-Graterford, Plaintiff repeatedly violated Defendant's time and attendance policies, as evidenced by her monthly Employee Performance Reviews which

---

[2] Reimert disputes Plaintiff's account of their interaction on July 14, 2016. (See Doc. No. 14-2 at ¶ 50 n.1.) But at the motion for summary judgment stage, the Court is compelled to view the evidence in the light most favorable to Plaintiff. Credibility is a question for the jury at trial.

were completed by her direct supervisors. In her November 2015 review, Lieutenant Boone, Plaintiff's trainee supervisor, noted that she took two days of "non-prescheduled leave," which are considered unexcused absences. (Doc. No. 14-2 ¶ 13.) Reviews from January, February, and March show that Plaintiff continued to take non-prescheduled leave. (Id. ¶¶ 16, 18, 20.) As a result, her supervisors consistently expressed that she "need[ed] improvement" adhering to Defendant's time and attendance policies.

On April 15, 2016, SCI-Graterford convened a Pre-Disciplinary Conference to discuss Plaintiff's conduct. As a result, on April 20, 2016, Lieutenant Boone issued Plaintiff a written reprimand, admonishing her for taking non-prescheduled absences. The written reprimand stated the following:

> On the date of April 15, 2016 a Pre Disciplinary Conference was held to ascertain the facts why you used non-prescheduled leave March 12, 2016 and March 13, 2016 for which you didn't have enough leave accrued to cover the two days causing you to be in AW status for March 13, 2016.
>
> As a result of the conference you are receiving the corrective action of a Written Reprimand. You are expected to report for duty as scheduled and on time. You are also expected to be aware of the time you have accrued and not use more time that [sic] what you have.
>
> Your attendance is being closely monitored. If this type of behavior continues further disciplinary actions will be taken to correct your attendance up to and including termination. I trust that you will make every effort to correct this area in your performance.

(Doc. No. 14-4 at 127.)

In spite of the written reprimand, Plaintiff took two more days of non-prescheduled leave in June. As noted above, she called out of work on June 16, 2016, the day she reported Reimert's sexual harassment to her supervisors. Then, on June 18, 2016, Plaintiff took a day of non-prescheduled leave because she was stressed from Reimert's harassment and her meetings with her supervisors. Plaintiff claims that she informed Lieutenant Glenn, Dana Williams, and the State

Employee Assistance Program ("SEAP") why she called out of work in June. (Doc. No. 17-1 ¶ 32.)

Plaintiff's issues with Defendant's time and attendance policies continued through July 2016. As explained in the preceding section, on July 14, 2016, Plaintiff was late to work because Reimert called her repeatedly during her commute, causing her to misuse her GPS and miss her exit. Knowing that she would be late, twenty-five minutes before her shift was scheduled to start, Plaintiff called Lieutenant Marcus Taylor, who was responsible for fielding calls from employees who called off or knew they would be late to work. (Id. ¶ 44.) On July 19, 2016, Plaintiff again took a non-prescheduled day of leave. In her deposition, Plaintiff testified that she called out of work because this was the day on which Reimert sexually assaulted her and threatened her life. (Id. ¶ 45.)

On July 26, 2016, Lieutenant Glenn recommended that SCI-Graterford convene another Pre-Disciplinary Conference to discuss Plaintiff's July 14, 2016 and July 19, 2016 violations of Defendant's time and attendance policies. (Doc. No. 14-2 ¶ 46.) On August 12, 2016, Lieutenant Glenn interviewed Plaintiff in preparation for the Pre-Disciplinary Conference. Plaintiff did not dispute that she violated the time and attendance policies, but informed Lieutenant Glenn that the violations were the result of Reimert's harassment. (Id. ¶¶ 48-50.)

For the purposes of the Pre-Disciplinary Conference, Plaintiff submitted a written personal statement that disputed Defendant's charges. In the personal statement, she again acknowledged that she violated Defendant's policies. However, she wrote that "[m]y call out and lateness was in no way a disregard to policy, rather a reaction to extreme distress created by another employee who would not let me break up with him." (Doc. No. 17-12.) The personal statement continued

to detail Plaintiff's relationship with Reimert, his harassing conduct, and the circumstances surrounding the July 14, 2016 incident and the July 19, 2016 incident.  (Id.)

On September 9, 2016, SCI-Graterford convened the Pre-Disciplinary Conference.  At the Conference, Plaintiff recognized that she violated Defendant's time and attendance policy, but again emphasized that the violations were caused by Reimert's harassment.  After hearing from Plaintiff and reviewing documents submitted by Plaintiff and various SCI-Graterford officials, Michael Romascavage, a Labor Relations Analyst  on the Pre-Disciplinary Conference panel, wrote up a synopsis of the hearing, which reads as follows:

> Regarding the date of July 14, 2016.  During the Pre Disciplinary Conference [Plaintiff] stated that she missed her exit from the Turnpike because she uses GPS on her cell phone.  An employee at SCI Graterford that [Plaintiff] has a relationship with continually called her causing her GPS to shut down.  When asked why she needed a GPS for directions after working at SCI Graterford for nearly a year she stated that she was tired and used the GPS to make her aware of the exit.

> Regarding the date of July 19, 2016 [Plaintiff] stated that she was upset due to being harassed by the aforementioned employee that she was in a relationship with.  She felt that she was not fit for duty.  However, she did not call off from work at least one hour prior to the start of her shift.  When she did call off it was for the entire shift.

(Doc. No. 17-20.)  The synopsis did not include details from Plaintiff's personal statement, including the fact that Reimert assaulted her and threatened her life on July 19, 2016.

Romascavage sent the synopsis of the Pre-Disciplinary Conference to SCI-Graterford Superintendent Cynthia Link, who ultimately decided to fire Plaintiff.  (Id. ¶¶ 60-65.)  On September 16, 2016, Superintendent Link sent Plaintiff a letter, informing her that her employment with Defendant had been terminated:

> This is to advise you that you are being terminated from your position of Corrections Officer Trainee, Probationary Civil Service status effective close of business effective September 19, 2016.

On September 9, 2016, a Pre-Disciplinary Conference was held to afford you an opportunity to respond to the charge(s) stated below. During the course of the conference, information was presented which established that you committed the following violations:

Unacceptable Attendance, More Specifically, AWOL.

Local Call-Off Policy 4.1.1, GRA 2.

Regarding the date of July 14, 2016. During the Pre Disciplinary Conference you stated that you missed your exist on the Turnpike because an employee at SCI Graterford that you had a relationship with continually called your phone causing your GPS to shut down. When asked why you needed a GPS for directions after working at SCI Graterford for nearly a year you stated that you were tired and used the GPS for directions to make you aware of the exit . . . .

Regarding the date of July 19, 2016, you stated that you were upset due to being harassed by the employee that you were in a relationship with. You felt that you were not fit for duty, however, you did not call off from work until 5:30 A.M. All employees are required to call off from work at least one hour prior to the start of their shift. Your regularly scheduled shift begins at 6:00 A.M.

Given the aforementioned information both charges were substantiated.

(Doc. No. 17-22 at 1-2.)

As noted earlier, Defendant never investigated Plaintiff's allegations regarding Reimert's conduct. Soon after Defendant terminated Plaintiff, Reimert returned to work, where he remains as an employee in good standing. (Doc. No. 17-10 at 51:2-8.)

## III.  STANDARD OF REVIEW

Granting summary judgment is an extraordinary remedy. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reaching this decision, the court must determine whether "the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Favata v. Seidel, 511 Fed. App'x 155, 158 (3d Cir. 2013) (quoting Azur v. Chase Bank, USA, Nat'l Ass'n, 601 F.3d 212, 216 (3d Cir. 2010)). A

disputed issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. Kaucher v. Cty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). For a fact to be considered "material," it "must have the potential to alter the outcome of the case." Favata, 511 Fed. App'x at 158. Once the proponent of summary judgment "points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." Id. (quoting Azur, 601 F.3d at 216).

In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. (alteration in original) (quoting Chambers ex rel. Chambers v. Sch. Dist. of Philadelphia Bd. of Educ., 587 F.3d 176, 181 (3d Cir. 2009)). The Court's task is not to resolve disputed issues of fact, but to determine whether there exists any factual issues to be tried. Anderson, 477 U.S. at 247-249. Whenever a factual issue arises which cannot be resolved without a credibility determination, at this stage the Court must credit the nonmoving party's evidence over that presented by the moving party. Id. at 255. If there is no factual issue, and if only one reasonable conclusion could arise from the record regarding potential outcome under the governing law, summary judgment must be awarded in favor of the moving party. Id. at 250.

## IV.    ANALYSIS

Defendant advances three arguments in support of its Motion for Summary Judgment. First, Defendant submits that Counts III and VI of the Complaint fail as a matter of law because PHRA claims against state agencies are barred by the Eleventh Amendment. (Doc. No. 14 at 1.) Second, Defendant contends that it is entitled to summary judgment on Count I of the Complaint because no reasonable jury could find that Defendant subjected Plaintiff to a hostile work

environment at SCI-Graterford based on the evidence in the record.  (Id.)  Third, Defendant argues that it is entitled to judgment as a matter of law on Count II because Plaintiff has failed to identify facts from which a reasonable jury could conclude that Defendant retaliated against Plaintiff.  (Id.)  For these reasons, Defendant urges the Court to grant its Motion for Summary Judgment.

Although Plaintiff does not contest Defendant's Eleventh Amendment argument, she asks the Court to reject Defendant's second and third arguments.  She submits that she has identified evidence that raises genuine issues of material facts as to whether Defendant subjected her to a hostile work place environment and whether Defendant retaliated against her for filing a sexual harassment complaint against Reimert.  As a result, Plaintiff requests that the Court deny Defendant's Motion for Summary Judgment on Counts I and II.  (Doc. No. 17.)

Additionally, the parties dispute whether the Complaint alleges a distinct sex discrimination claim, separate from the hostile work environment claim.  Defendant submits that the pleadings are devoid of any evidence, arguments, or allegations from which it could have divined that Plaintiff filed a sex discrimination claim, apart from the hostile work environment claim.  (Doc. No. 20 at 8-9.)  Plaintiff disagrees, and contends that the supposed sex discrimination claim survives because Defendant did not address it in its Motion for Summary Judgment.  (Doc. No. 17 at 1 n.2.)

First, the Court will evaluate the three arguments made in Defendant's Motion for Summary Judgment.  Thereafter, the Court will consider whether Plaintiff sued Defendant under a separate sex discrimination claim, apart from the hostile work environment claim.

**A. Defendant is Entitled to Judgment on Counts III and IV of the Complaint Because Plaintiff's PHRA Claims are Barred by the Eleventh Amendment**

As an initial matter, Defendant argues that it is entitled to judgment as a matter of law on Count III and Count IV of the Complaint because the Eleventh Amendment bars federal suits against states and state agencies.[3] (Doc. No. 14 at 5.) The Court agrees.

The Eleventh Amendment immunizes a state from suits in federal court by citizens of that state or other states. Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 98 (1984). A state can consent to a suit against it in federal court and waive its Eleventh Amendment immunity, but the Commonwealth of Pennsylvania has not done so for suits filed against it in federal court pursuant to the PHRA. Patterson v. PA Office of Inspector General, 243 Fed. App'x 695, 696 (3d Cir. 2007). In fact, the Pennsylvania legislature has explicitly withheld consent to suit in federal court under the PHRA: "Nothing contained in this subchapter shall be construed to waive the immunity of the Commonwealth from suit in Federal courts guaranteed by the Eleventh Amendment to the Constitution of the United States." 42 Pa. Cons. Stat. Ann. § 8521(b). Consequently, "a plaintiff may never pursue a PHRA claim against Pennsylvania or its agencies in federal court." Williams v. Pennsylvania State Police Bureau of Liquor Control Enforcement, 108 F. Supp. 2d 460, 465 (E.D. Pa. 2000). See also Holt v. Pennsylvania, No. 17-2511, 2018 WL 2363535, at *6 (E.D. Pa. May 24, 2018) (dismissing PHRA claims against the Commonwealth and the Pennsylvania State Police).

As a Commonwealth agency, Defendant possesses immunity in federal court for claims filed against it under the PHRA. See Dennison v. Pennsylvania Dep't of Corrections, 268 F. Supp.

---

[3] In her Response to Defendant's Motion for Summary Judgment, Plaintiff stated that she would withdraw her PHRA claims voluntarily. (Doc. No. 17 at 1.) For the sake of completeness, the Court will discuss why those claims fail.

2d 387, 396 (M.D. Pa. 2003). Therefore, the Court will grant Defendant's Motion for Summary

Judgment as to Counts III and IV of the Complaint, both of which were filed pursuant to the PHRA.

**B. A Reasonable Jury Could Conclude that Defendant Subjected Plaintiff to a Hostile Work Environment at SCI-Graterford**

Second, Defendant argues that it is entitled to judgment as a matter of law on Count I of

the Complaint because Plaintiff has not identified evidence from which a reasonable jury could

that Defendant subjected her to a hostile work environment while she was employed at SCI-

Graterford. (Doc. No. 14 at 7.) The Court disagrees.

Title VII of the Civil Rights Act of 1964 ("Title VI") makes it unlawful for "an employer .

. . to discriminate against any individual with respect to his compensation, terms, conditions, or

privileges of employment . . . because of such individual's race, color, religion, sex, or national

origin." 42 U.S.C. § 2000e-2(a)(1). Relevant here, the Supreme Court has explained that Title

VII "is not limited to 'economic' or 'tangible' discrimination." Meritor Sav. Bank, FSB v. Vinson,

477 U.S. 57, 64 (1986). It also bars "a discriminatorily hostile or abusive [work] environment."

In re: Tribune Media Company, 902 F.3d 384, 399 (3d Cir. 2018) (quoting Harris v. Forklift Sys.,

Inc., 510 U.S. 17, 21 (1993)).

To evaluate whether a work environment is hostile, a court must look at all the

circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is

physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably

interferes with an employee's work performance." Id. (quoting Harris, 510 U.S. at 23.) The Third

Circuit Court of Appeals has held that to prevail on a hostile work environment claim, a plaintiff

must show: (1) the employee suffered intentional discrimination because she is a member of a

protected class; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally

affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person in

similar circumstances; and (5) the existence of <u>respondeat superior</u> liability. <u>Castleberry v. STI Grp.</u>, 863 F.3d 259, 263 (3d Cir. 2017) (citing <u>Mandel v. M & Q Packaging Corp.</u>, 706 F.3d 157, 167 (3d Cir. 2013)).

### 1. A Reasonable Jury Could Conclude that the Alleged Harassment was Based on Plaintiff's Sex

Defendant first argues that the alleged discrimination and harassment was not based on Plaintiff's sex. (Doc. No. 14 at 8.) It claims that the consensual nature of her relationship with Reimert precludes the Court from finding in her favor. (<u>Id.</u> at 8-9.) The Court disagrees. Viewed in the light most favorable to Plaintiff, testimony about Reimert's sexual comments and conduct in the workplace support Plaintiff's claim that Reimert's harassment occurred because she is a woman.

With respect to whether harassment is based on sex, the Supreme Court has stated that "[t]he critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." <u>Connell v. Nicholson</u>, 318 Fed. App'x 75, 77 (3d Cir. 2009) (internal quotation marks omitted) (quoting <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 80 (1998)). "The intent to discriminate on the basis of sex in cases involving sexual propositions, innuendo, pornographic materials, or sexual derogatory language is implicit, and thus should be recognized as a matter of course." <u>Andrews v. City of Philadelphia</u>, 895 F.2d 1469, 1482 n.3 (3d Cir. 1990).

Here, Reimert admitted that he discussed his sex life with Plaintiff with co-workers in the workplace. He encouraged male co-workers to ask her lewd questions, including whether Reimert satisfied her sexually and whether she would take care of their sexual needs. (Doc No. 17-5 at 31:5-32:8.) At one point, when Plaintiff was ill, a co-worker asked her whether she was pregnant with Reimert's child. (Doc. No. 17-1 ¶ 28.) Reimert also spread rumors that Plaintiff engaged in

sexual acts with co-workers in the bathrooms at SCI-Graterford. (Doc. No. 17-3 at 167:21-34.) As their relationship deteriorated, Reimert told Plaintiff to stop speaking to male co-workers and threatened to assault male co-workers when she engaged in conversations with them at work. (Doc. No. 17-5 at 32:9-33-5.) Additionally, Reimert threatened to ruin Plaintiff's reputation at work if she left him. (Id. at 31:5-18.)

Viewed in the light most favorable to Plaintiff, a reasonable jury could conclude that these comments and actions were gender-based. Plaintiff was exposed to behavior to which male correctional officers were not exposed. If she were a man, co-workers would not have asked her about a supposed pregnancy. Nor would Reimert have encouraged co-workers to ask her about her sex life and proclivities. Likewise, Reimert would not have directed her to refrain from contact with male co-workers if she were not a woman. As a result, a reasonable jury could interpret these comments, innuendos, and propositions to be sex-based and conclude that Reimert's actions exposed Plaintiff to disadvantageous terms and conditions of employment to which male correctional officers were not exposed.

**2. A Reasonable Jury Could Conclude that the Harassment was Severe or Pervasive**

Defendant does not make any arguments as to whether the discrimination and harassment alleged by Plaintiff was severe or pervasive. But viewed in the light most favorable to Plaintiff, the evidence could be viewed by a reasonable juror as sufficiently severe or pervasive to support a hostile work environment claim. The "severe or pervasive" standard requires conduct that is sufficient "to alter the conditions of [the employee's] employment and create an abusive working environment." Moody, 870 F.3d at 214-15 (quoting Meritor, 477 U.S. at 67.) "[W]hether an environment is sufficiently hostile or abusive must be judged by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically

threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 270-71 (2001) (citation and internal quotation marks omitted).

From the evidence recited in the previous section, a reasonable jury could find that Reimert's conduct in the workplace was severe or pervasive. Reimert's discussion of Plaintiff's sex life and proclivities at work undoubtedly affected Plaintiff's reputation. At Reimert's encouragement, co-workers asked Plaintiff pornographic questions, laden with sexual innuendo and personal derision. While these comments are not physically threatening, they are certainly humiliating. Moreover, Plaintiff was forced to bear more than a single derogatory comment. Indeed, she faced an ongoing litany of crude insults and abusive questions. Although Reimert denies this conduct, the Court must view the facts in the light most favorable to Plaintiff, the non-movant. And from this viewpoint, Plaintiff's account of her treatment at SCI-Graterford provides enough evidence upon which a reasonable jury could conclude that she experienced severe or pervasive harassment. The parties' differing accounts of her treatment present disputed material facts for a jury to resolve.

### 3. A Reasonable Jury Could Conclude that Plaintiff Subjectively Perceived Her Work Environment to be Abusive, Offensive, and Hostile

If a victim does not subjectively perceive her work environment to be abusive, the conduct cannot be said to have altered the conditions of her employment, and there is no Title VII violation. Harris, 510 U.S. at 21-22. Defendant does not advance an argument as to whether Plaintiff subjectively perceived her work environment to be hostile. In any event, from Plaintiff's testimony, it is evident that she found Reimert's conduct offensive, abusive, and hostile. Plaintiff testified that she frequently worried that Reimert "was able to manipulate her to stay with him" for fear that he would further ruin her reputation at work. (Doc. No. 17-5 at 31.) Plaintiff also stated

that she found Reimert's conduct physically, mentally, and emotionally abusive.  (Id.)  As a result, Plaintiff reported his sexual harassment to her supervisors and filed this action.

### 4. A Reasonable Jury Could Conclude that a Reasonable Person Would Objectively Perceive Plaintiff's Work Place Environment to be Abusive, Offensive, and Hostile

To prevail on a hostile work environment claim, it is not sufficient to identify conduct that created a subjectively hostile work environment.  A plaintiff must also establish that the conduct at issue created an objectively hostile work environment.  That is, the plaintiff must demonstrate that a reasonable person would find the environment offensive, hostile, or abusive.  Harris, 510 U.S. at 21.  From the preceding sections, it is manifest that a reasonable person in Plaintiff's circumstances could interpret the work environment at SCI-Graterford to be abusive, offensive, and hostile.   Plaintiff was subjected to a litany of lewd innuendos, pornographic comments, and offensive questions.  These comments go beyond the trivial criticisms and petty insults that one might reasonably expect in a workplace.  As a result, the objective factor of the hostile work environment claim is met at this stage in the proceedings.

### 5. A Reasonable Jury Could Conclude that Defendant was Negligent in Controlling the Work Environment at SCI-Graterford

Whether an employer is liable for the discriminatory acts of its employee depends on the employee's status.  If the harassing employee is a supervisor and the harassment results in a tangible employment action, the employer is strictly liable for the employee's actions.  Vance v. Ball State University, 570 U.S. 421, 424 (2013).  But if the harassing employee is the victim's co-worker, "the employer is liable only if it was negligent in controlling working conditions."   Id.

The parties dispute whether Reimert was Plaintiff's supervisor or whether he was Plaintiff's co-worker.  Defendant argues that Plaintiff and Reimert were merely co-workers, and that the Court should evaluate its culpability under a negligence standard.  (Doc. No. 14.)

Conversely, Plaintiff argues for a strict liability standard, contending that Reimert was a supervisor who wielded power and influence over her.  (Doc. No. 17.)

In <u>Vance</u>, the Supreme Court held that an employee is a "supervisor" for the purposes of vicarious liability "if he or she is empowered by the employer to take tangible employment actions against the victim."  <u>Vance</u>, 570 U.S. at 450.  An employee who is empowered to take a tangible employment action against the victim is empowered to affect "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  <u>Id.</u> at 429 (quoting <u>Burlington Industries, Inc. v. Ellerth</u>, 524 U.S. 742, 761 (1998)).

The Third Circuit recently discussed whether a harassing employee was a supervisor or a co-worker.  In <u>Moody v. Atlantic City Board of Education</u>, 870 F.3d 206 (3d Cir. 2018), a female custodian brought a hostile work environment claim against her employer, alleging that the employer was strictly liable for the harassing conduct of a custodial foreman.  There, the court disagreed with the district court's finding that the custodial foreman was the plaintiff's co-worker. The court wrote that "[t]here is no dispute that [the foreman] had the authority to decide whether to summon [plaintiff] to work . . . because the Board granted him that authority as the custodial foreman.  In fact, a Board employee suggested that [plaintiff] introduce herself to the custodial foreman as a means to obtain work assignments."  <u>Id.</u> at 216.  Furthermore, the custodial foreman had the power to affect a significant change in the plaintiff's benefits—he could decrease her work shifts, eliminate her overtime, or even assign her no hours.  As a result, the court found that the custodial foreman was the plaintiff's supervisor.  <u>Id.</u> at 217.

<u>Moody</u> is clearly distinguishable from this case.  Unlike the custodial foreman in <u>Moody</u>, Reimert was not empowered to take tangible employment actions against Plaintiff.  He did not

assign her work, he did not conduct her performance reviews, and he did not have the power to discipline her. Plaintiff argues that Reimert's role in training her and other employees placed him in a position of power. (Doc. No. 17 at 18.) But the fact that Reimert made a single presentation at one training event does not rise to the level of exercising supervisory authority over Plaintiff. Indeed, his one experience as a trainer did not give him the power to take tangible employment actions against Plaintiff or any other employee.

Plaintiff further argues that Reimert's status in the Honor Guard and the Fire Emergency Response Team gave him the ability to determine whether Plaintiff gained entry to these organizations. (Id.) Even if evidence existed to support this argument, there is a perceptible difference between wielding influence in volunteer organizations and having the power to take tangible employment actions. While Plaintiff may have been disappointed if she were turned away from the Honor Guard or the Fire Emergency Response Team as a result of Reimert's influence, those rejections would not have altered the terms and conditions of her employment at SCI-Graterford. They would not have resulted in different work assignments, lower pay, disciplinary actions, or a change in benefits. Consequently, the Court is persuaded that Reimert was Plaintiff's co-worker, and not her supervisor.

Having found that Reimert, an harassing employee, was Plaintiff's co-worker, the inquiry before the Court becomes whether a reasonable jury could conclude that Defendant was negligent in controlling its working environment. Under the negligence standard, an employer is liable for failure to respond to harassment "if a plaintiff proves that management-level employees had actual or constructive knowledge about the existence of a sexually hostile work environment and failed to take prompt and adequate remedial action." Jones v. Pennsylvania State Police, No. 16-4205, 2017 WL 4386994, at *3 (E.D. Pa. Oct. 3, 2017) (quoting Knabe v. Boury Corp, 114 F.3d 407, 411

(3d Cir. 1997)).  For example, in <u>Knabe</u>, the Third Circuit found that the employer's actions were not negligent where the management undertook an investigation of the employee's complaint within a day of the complaint being filed, spoke to the alleged harasser about the allegations, informed him of the company's sexual harassment policy, and warned him that the company does not tolerate harassment.  <u>Knabe</u>, 114 F.3d at 409.

In this case, beginning on June 16, 2016, Plaintiff lodged several complaints about Reimert's harassing conduct in the workplace.  She relayed her concerns to Dana Williams, Defendant's Human Resource Director, and Lieutenant Heidi Glenn, her direct supervisor.  Additionally, she filed a sexual harassment complaint against Reimert with the State Employee Assistance Program.  But at no point did management at SCI-Graterford investigate Plaintiff's allegations, speak to Reimert about his conduct, or advise him about Defendant's sexual harassment policies.

Defendant argues that its failure to investigate Plaintiff's allegations is irrelevant because Plaintiff did not report Reimert's harassment until June 16, 2016, the day before Reimert left work on FMLA leave.  It claims that "[i]t is undisputed that Plaintiff never encountered Reimert at the workplace thereafter and that he therefore never harassed her at the workplace after [she] ma[de] that complaint."  (Doc. No. 14 at 10.)  As a result, Defendant claims that it had no obligation to investigate Reimert's conduct.  But this argument is not convincing.  Although Reimert left SCI-Graterford on FMLA leave in June 2016, there is no evidence that his period of leave was indefinite.  Consequently, management at SCI-Graterford should have known that upon Reimert's return to work, he and Plaintiff would have worked together once again.  That Plaintiff's eventual termination prevented that scenario from playing out is insignificant.  At the time Plaintiff lodged her complaint against Reimert, management at SCI-Graterford had every reason to believe that the

two employees would work together again, and that Plaintiff might face further harassment upon Reimert's return. Dana Williams, Defendant's Human Relations Director, testified that Defendant's policies required prison management to investigate sexual harassment complaints, but admitted that SCI-Graterford never investigated Reimert's conduct. From this evidence, a reasonable jury could infer that Defendant was negligent in controlling its workplace environment at SCI-Graterford.

In sum, Plaintiff has identified evidence that creates genuine issues of material fact as to whether Defendant subjected Plaintiff to a hostile work environment while she worked at SCI-Graterford. As a result, Defendant is not entitled to summary judgment on Count I of the Complaint.

### C. A Reasonable Jury Could Conclude that Defendant Engaged in Retaliation by Firing Plaintiff for Reporting Sexual Harassment at SCI-Graterford

Third, Defendant contends that it is entitled to judgment as a matter of law on Count II because Plaintiff has not pointed to specific evidence from which a reasonable jury could find that Defendant retaliated against Plaintiff by firing her after she complained about sexual harassment at SCI-Graterford. (Doc. No. 14 at 11.) The Court disagrees.

Title VII prohibits an employer from discriminating "against any of his employees . . . because he opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). A court analyzes a Title VII retaliation claim under the burden shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). First, a plaintiff must establish a prima facie case of retaliation, which requires identifying evidence that: "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal

connection between her participation in the protected activity and the adverse employment action."

Moore v. City of Philadelphia, 461 F.3d 331, 340-41 (3d Cir. 2006) (quoting Nelson v. Upsala Coll., 51 F.3d 383, 386 (3d Cir. 1995)).

Here, Defendant does not dispute that Plaintiff engaged in an activity protected by Title VII when she lodged a sexual harassment complaint against Reimert with the management at SCI-Graterford.  Nor does Defendant dispute that it took an adverse employment action against her when it terminated her on September 16, 2016.  (Doc. No. 14 at 12.)  What it does dispute is that Plaintiff can identify evidence from which a reasonable jury could find that there was a causal connection between Plaintiff's sexual harassment complaint and Defendant's decision to fire her. (Id.)  But the Court is not persuaded by Defendant's arguments.

To establish the third element of a prima facie case of retaliation, "a plaintiff must show a causal connection between the plaintiff's opposition to, or participation in proceedings against, unlawful discrimination and an action that might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Moore, 461 F.3d at 341-42.  The Third Circuit has explained that a court should consider "a broad array of evidence" in determining whether a causal link exists to survive a motion for summary judgment.  Farrell v. Planters Lifesavers Co., 206 F.3d 271, 284 (3d Cir. 2000).  "Where the temporal proximity between the protected activity and the adverse action is 'unusually suggestive,' it is sufficient standing alone to create an inference of causality and defeat summary judgment."  LeBoon v. Lancaster Jewish Community Center Ass'n, 503 F.3d 217, 232 (3d Cir. 2007).  If the temporal proximity is not unusually suggestive, the court looks to whether the "proffered evidence, looked at as a whole, may suffice to raise the inference."  Farrell, 206 F.3d at 280.  "Among the kinds of evidence that a plaintiff can proffer are intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for

terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus." LeBoon, 503 F.3d at 232-33.

In this case, Defendant contends that the temporal proximity between Plaintiff's June 16, 2016 complaint to Dana Williams and her September 16, 2016 termination is not unusually suggestive. (Doc. No. 14 at 12.) But Defendant ignores the fact that in addition to the June 16, 2016 complaint, Plaintiff also complained to Lieutenant Heidi Glenn on June 29, 2016, filed a SEAP complaint in late June 2016, and then addressed issues about Reimert's conduct with Lieutenant Glenn on August 1, 2016 and August 3, 2016. Further, Plaintiff consistently repeated her complaints of sexual harassment and a hostile work environment throughout Defendant's investigation into her violations of the time and attendance policies and at her Pre-Disciplinary Conference on September 9, 2016. Taken together, this evidence raises an inference that the temporal proximity between Plaintiff's various complaints and her termination was unusually suggestive of retaliatory animus.

Additionally, Plaintiff points to other evidence that creates an inference of a causal link between the complaints and the termination. For example, when Plaintiff lodged her complaints, she was met with animosity and discrimination. The record shows that Plaintiff filed several sexual harassment complaints throughout June and July 2016. Dana Williams, Defendant's Human Relations Director, testified that Defendant's policies required prison management to investigate sexual harassment complaints, but Plaintiff's complaints about Reimert's conduct were never reported, never investigated, and never remedied. In fact, Reimert still works at SCI-Graterford and remains an employee in good standing. (Doc. No. 17-10 at 51:2-8.)

These facts, viewed in the light most favorable to Plaintiff, make it more likely than not that a reasonable jury could infer a causal connection between Plaintiff's sexual harassment

complaints and her termination.  As a result, genuine issues of material fact exist as to whether Plaintiff can establish a prima facie case of discrimination.

At the second step of the <u>McDonnell Douglas</u> framework, a defendant must provide a legitimate, non-discriminatory reason for a plaintiff's termination.  Here, Defendant has met this burden.  It has identified evidence that it terminated Plaintiff because she repeatedly violated Defendant's time and attendance policies.  (Doc. No. 14.)

Finally, at the third step of the <u>McDonnell Douglas</u> framework, the burden shifts back to the plaintiff "to convince the factfinder both that the employer's proffered explanation was false [that is pretext], and that the retaliation was the real reason for the adverse employment action." <u>Carvalho-Grevious v. Delaware State University</u>, 851 F.3d 249, 257 (3d Cir. 2017) (alteration in original) (quoting <u>Moore</u>, 461 F.3d at 342).  Recently, the Supreme Court concluded that a plaintiff's ultimate burden is to prove that retaliatory animus was the "but-for" cause of the adverse employment action.  <u>University of Texas Southwestern Medical Center v. Nassar</u>, 570 U.S. 338, 352 (2017).  Essentially, a plaintiff must show that the adverse employment would not have occurred in the absence of the defendant's retaliatory animus.  <u>Carvalho-Grevious</u>, 851 F.3d at 258 (citing <u>Nassar</u>, 570 U.S. at 352).

Here, Plaintiff has identified genuine issues of material fact as to whether Defendant's proffered legitimate, non-discriminatory reason for firing her was merely pretext for retaliatory animus.  For example, throughout Defendant's investigation into her violations of the time and attendance policies, Plaintiff consistently repeated that the July 14, 2016 and July 19, 2016 violations were the result of Reimert's sexual harassment.  In her personal statement to the Pre-Disciplinary Conference panel, Plaintiff emphasized these incidents and described them in great detail.  Then, at the Conference, she testified about the incidents and Reimert's harassment.

Notwithstanding her testimony, Michael Romascavage's synopsis of the Conference neglected to include details about Plaintiff's assault. In her deposition, Superintendent Cynthia Link admitted that an assault would justify violations of Defendant's time and attendance policies. And yet, Plaintiff was still fired. (Doc. No. 17-21 at 66:2-17.) Significantly, at no time during Defendant's investigation into Plaintiff's time and attendance policy violations did Defendant investigate Reimert's harassing conduct. In fact, Reimert returned to work soon after Plaintiff was fired, and remains an employee in good standing at SCI-Graterford. (Doc. No. 17-10 at 51:2-8.)

Taken together, these facts support an inference that Plaintiff was fired because she complained about her sexual harassment at SCI-Graterford, not because she violated Defendant's time and attendance policies. The inconsistencies in Defendant's investigation into Plaintiff's conduct and the animosity she faced when she reported Reimert's conduct create genuine issues of material fact as to the true reason she was terminated. For these reasons, the Court will deny Defendant's Motion for Summary Judgment as to Count II.

### D. Plaintiff's Sex Discrimination Claim

Finally, the Court must address whether in the Complaint Plaintiff successfully pled a sex discrimination claim, separate and distinct from the hostile work environment claim. Plaintiff argues that (1) she successfully brought a distinct sex discrimination claim against Defendant in Count I of the Complaint, and (2) the sex discrimination claim survives summary judgment because Defendant did not make any arguments against the claim in its Motion. (Doc. No. 17 at 1 n.2.) Conversely, Defendant submits that it did not attack the supposed sex discrimination claim because Plaintiff did plead one. (Doc. No. 20.)

Title VII broadly prohibits discrimination on the basis of sex. Within this broad prohibition exist different types of sex discrimination cases. For example, a plaintiff can file a sex

discrimination disparate treatment claim, wherein she claims that her employer treated her differently because of her gender. A plaintiff can also file a sex discrimination disparate impact claim, asserting that her employer's actions disparately impacted her gender. Additionally, sexual harassment is a type of sex discrimination. See Moody, 870 F.3d at 213. Courts have created two categories of sexual harassment cases. First, a plaintiff can bring a sexual harassment claim pursuant to a quid pro quo theory—that is, the plaintiff claims that the harasser threatened her with an adverse employment action if she did not accede to his sexual demands. Id. at 213 n.10. Second, like here, a plaintiff can bring a sexual harassment claim based on a hostile work environment theory. Id. Thus, suing an employer for "sex discrimination" can implicate several different claims.

In Count I of the Complaint, Plaintiff claims that "[t]he actions of Defendant, through its agents, servants and employees, in subjecting Plaintiff to a hostile work environment, sexual harassment, and sex discrimination, constituted a violation of Title VII." (Doc. No. 1 at 12.) In Count II, Plaintiff brings a claim of retaliation under Title VII. (Id.) Then, in the parties' joint Rule 26(f) Report,[4] which was filed on April 27, 2018, under "Discussion of Claims, Defenses and Relevant Issues," the Report states that "Plaintiff brings claims for hostile work environment and retaliation under Title VII . . . ." (Doc. No. 7 at 1.) The Report makes no mention of a separate "sex discrimination" claim.

Based on the information contained in the Complaint and the substance of the Rule 26(f) Report, Defendant did not discuss a separate sex discrimination claim in its Motion for Summary

---

[4] Federal Rule of Civil Procedure 26(f) requires parties in an action to confer at least 21 days before a scheduling conference before the Court to "consider the nature and basis of their claims and defenses and the possibilities for promptly settling or resolving the case . . . ." Fed. R. Civ. P. 26(f)(2). After the conference, the parties are responsible for filing a report of the 26(f) conference with the court. Id.

Judgment.  (See Doc. No. 14.)  But in Plaintiff's Response to Defendant's Motion, she wrote the following:

> In their [sic] Motion, Defendant does not move for summary judgment on Plaintiff's sex discrimination claim.  Instead, Defendant only addresses Plaintiff's hostile work environment claim and retaliation claims.  Accordingly, regardless of the Court's disposition of Defendant's motion, the sex discrimination claim will remain for trial.

(Doc. No. 17 at 1 n.2) (internal citations omitted).

In its Reply, Defendant objected to Plaintiff's contention that she brought a sex discrimination claim distinct from the hostile work environment claim.  In support of its argument, Defendant points to the substance of the Complaint, the Rule 26(f) Report, and the fact that Plaintiff did not discuss a separate sex discrimination claim at the parties' settlement conference or throughout the discovery process.  (Doc. No. 20 at 8-9.)

The plain language of the Complaint does not demonstrate that Plaintiff pled a sex discrimination claim, separate and distinct from the hostile work environment claim.  In Count I, Plaintiff states that Defendant subjected her to a hostile work environment, sexual harassment, and sex discrimination.  (Doc. No. 1 at 12.)  As noted above, Title VII broadly prohibits discrimination based on sex, but courts have separated sex discrimination cases into several categories, including sexual harassment cases, disparate impact sex discrimination cases, and disparate treatment sex discrimination cases.  Within the sexual harassment category, a plaintiff can proceed on a quid pro quo theory or a hostile work environment theory.  Nowhere in the Complaint does Plaintiff mention a disparate impact claim, a disparate treatment claim, or a quid pro quo claim.  She only discusses "hostile work environment, sexual harassment, and sex discrimination."  But reading the Complaint as a whole, it does not appear that Plaintiff intended to bring three distinct claims in Count I.  Indeed, Count I states that the actions of Defendant constituted a single violation of Title

VII, not three. Accordingly, the Court is convinced that Plaintiff intended to sue under one theory—hostile work environment—and that the two subsequent terms describe how the hostile work environment claim fits into the sex discrimination framework. That is, the language in Count I means that Plaintiff brought a hostile work environment claim, which is a type of sexual harassment, which is sex discrimination.

The parties' joint Rule 26(f) Report supports this interpretation. In the Report, Plaintiff does not write that she sued Defendant under a separate theory of sex discrimination. The Report only states that Plaintiff brought a hostile work environment claim and a retaliation claim. Further, the Report explains issues and evidence related to Plaintiff's hostile work environment claim and Plaintiff's retaliation claim, but does not discuss issues that relate to a separate sex discrimination claim. (Doc. No. 7 at 1-2.) Moreover, the parties' conduct shows that Plaintiff did not sue Defendant on a separate sex discrimination theory. At no point during discovery did Plaintiff make any requests or disclosures relating to a separate sex discrimination claim. Nor did Plaintiff discuss the sex discrimination claim at the parties' settlement conference. (Doc. No. 20 at 8-9.)

For these reasons, the Court is persuaded that Plaintiff has not sued Defendant on a separate sex discrimination theory. Although Plaintiff's hostile work environment claim and retaliation claim will remain for trial, Plaintiff's supposed sex discrimination claim will not.

## V. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. No. 14) will be granted in part and denied in part. Summary Judgment will be entered in favor of Defendant on Count III and Count IV of the Complaint, but denied on Count I and Count II. An appropriate Order follows.